UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LISA J. GILLARD<br>　　　　　Plaintiff<br><br>v.<br><br>SOUTHERN NEW ENGLAND SCHOOL OF LAW<br>　　　　　Defendant | DOCKET NO. 05-10244-RCL |

**MEMORANDUM IN SUPPORT OF DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

### STATEMENT OF FACTS

The plaintiff Lisa Gillard entered the defendant Southern New England School of Law (SNESL) as a first year law student in September 2002. At that time she had a bachelors and a masters degree in English. Prior to entering SNESL she had taught English at the college level (Plaintiff's Answers to Defendant's Interrogatories Nos. 4 & 5, attached as Exhibit B to the Affidavit of Allen N. David; Affidavit of Michael Hillinger, Ex. A). Despite her past academic accomplishments, she did not do well as a law student. In June 2003 she was dismissed from SNESL on academic grounds. She claims that she is handicapped within the meaning of the Americans with Disabilities Act (ADA) because she has a learning disability which, in her own words, results in an "inability to apply rules to fact patterns" and problems "identifying issues." She alleges her dismissal was illegal because SNESL failed to provide her with reasonable accommodations. As will be shown, the plaintiff is not disabled within the meaning of the ADA and SNESL granted every accommodation the plaintiff requested.

1. **<u>The Defendant's Academic Requirements</u>**. SNESL requires part-time first year law students such as the plaintiff to take full year courses in Property, Torts, and Legal Research and Writing. These courses are worth six credits each. In addition, students are required to take a one-semester course in Legal Methods, which is worth one credit.[1] Courses are graded on a 100 point scale. A passing mark is 60, and grades below 70 are considered unsatisfactory. If at the end of the first semester a student has a final grade below 70 or a mid-term grade in a full year course below 70, she is referred to the academic support program. If at the end of the year a student has either (1) received a cumulative average below 70, (2) failed a required course, (3) received a cumulative total of 9 credits or more of grades below 70, or (4) fails to comply with prior probationary or supervisory conditions, the student is subject to academic dismissal. Dismissal, however, is not automatic. The matter is considered by the Academic Standards Committee, which considers any information the student wishes to submit. If the student is dissatisfied with the decision of the Academic Standards Committee, she can appeal the decision to the Full Faculty. (Hillinger Aff. ¶¶ 2&3.).

2. **<u>The Plaintiffs' Performance</u>**. The plaintiff's grades at the end of the first semester were:

| | |
|---|---|
| Legal Methods | 66 |
| Legal Writing I | 75 |
| Property I | 58 |
| Torts I | 64 |

---

[1] The plaintiff did not have a full schedule of courses. Full time first-year students are also required to take Contracts, Civil Procedure, Criminal Law, and Ethics (Hillinger Aff. ¶ 2).

(Id. ¶ 6). On January 23, 2003 she was advised that her grades were unsatisfactory and she was referred to the Academic Support Program. (Id. ¶ 8, Ex. C)

Her second semester grades were (Id. ¶ 6):

| | |
|---|---|
| Legal Writing II | 69 |
| Property II | 54 |
| Torts II | 59 |

Her cumulative average was 61.9, she had failed two required courses, and had received a grade of less than 70 in 15 of the 19 credits she had taken (Id. ¶ 6, Ex. B). On May 12, 2003, she was notified that she was subject to academic dismissal (Id. ¶ 13, Ex. F). On June 5, 2003, the Academic Standards Committee notified her that she could no longer continue at the School (Id. ¶ 14, Ex. H). She appealed to the Full Faculty, which voted to deny the appeal on June 26, 2003 (Id. ¶ 15, Ex. I).

    3.    **<u>SNESL's Accommodations for the Plaintiff</u>**. The plaintiff made two requests for accommodations while she was a student, both of which the defendant granted. First, at the end of the first semester she requested transfers into other sections of her Torts and Legal Writing classes. The request was not based on any claim of a handicap, nor was it supported by any opinion from a physician or psychologist. Rather, the plaintiff requested a transfer because in one case, Legal Writing, she did not like the professor's teaching style, and in the other, Torts, she had a personality conflict with the professor. (Id. ¶ 7) In both cases, she thought her performance would improve if she were allowed to transfer. The defendant's policy is that transfers in full year courses like Legal Writing and Torts will not be made. In the plaintiff's case, however, the plaintiff accommodated her wishes and approved the transfer. (Id.) Her marks in both classes went down.

Second, on May 7, 2003, the defendant received a report from a psychologist, Dr. Dorothy Brown, stating that the plaintiff has "an Attention Deficit Disorder diagnosis and has weakness in the areas of visual speech, visual perception and working memory." (Id. ¶ 9, Ex. D) Dr. Brown "recommended that Lisa be allowed at least an extra hour on her exams and computer use." The plaintiff had two exams at the end of the second semester of 2004: Torts, originally scheduled for May 9, and Property, originally scheduled for May 12. She was allowed to reschedule both examinations – until May 13 and May 14 respectively – given an extra hour for each exam, placed in a separate room from other students to reduce distractions, and allowed to use a computer. (Id. ¶ 10 & 11) Despite these accommodations, her marks went down from her mid-term marks – from 64 to 55 in Torts and from 58 to 52 in Property – and she failed both courses. (Id. Ex. B) She was dismissed for academic reasons on June 26, 2003.

On April 21, 2004, ten months after her dismissal, Dr. Brown wrote a letter to "To Whom It May Concern." In the letter, Dr. Brown states she "would support Lisa taking exams by having them read to her." (Affidavit of Dorothy Brown ¶ 8, Ex. D) The letter came ten months after the plaintiff had been dismissed and was never sent to the defendant. In fact, the defendant did not know of the letter until the plaintiff filed this suit. (Hillinger Aff. ¶ 17)

## ARGUMENT

I.  **THE DEFENDANT DID NOT DISCRIMINATE AGAINST THE PLAINTIFF ON THE BASIS OF A HANDICAP.**

The plaintiff alleges that the defendant discriminated against her because of a handicap, i.e., a learning disability. She refers in her Complaint to the "ADA" and "Section 504." The defendant assumes she intends to allege violations of the Americans with Disabilities Act, 42 U.S.C. §§12101-12213, and the Rehabilitation Act of 1973, 29 U.S.C. §794. These statutes

prohibit discrimination against individuals with disabilities.  For purposes of this motion, the defendant will assume that the plaintiff has attention deficit disorder and that she "has a weakness in the area of visual speed, visual perceptual organization and working memory."  Even with the benefit of this assumption, the plaintiff cannot establish that the defendant discriminated against her on the basis of disability.

      **A.**     **The Plaintiff is Not Disabled Within the Meaning of the ADA**

Under the ADA, "disability" means "a physical or mental impairment that substantially limits one or more major life activities. ..." 42 U.S.C. §12102(2)(A).  "Major life activity" means "functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and walking."  28 C.F.R. §36.104(2).  The statute "create[s] a demanding standard for qualifying as disabled" and the terms "substantially limits" and "major life activity" must be interpreted strictly.  Toyota Motor Mfg., Inc. v. Williams, 534 U.S. 184, 197 (2002).  "Merely having an impairment does not make one disabled for purposes of the ADA.  Claimants also need to demonstrate that the impairment limits a major life activity."  Id. at 195.  They cannot demonstrate this by simply submitting evidence of a medical diagnosis of impairment.  Id. at 198.  Viewed against this background, it is clear that the plaintiff's impairment does not substantially limit a major life activity.

According to Dr. Dorothy Brown, the psychologist who tested the plaintiff, the plaintiff has "attention deficit disorder and weaknesses in the areas of visual speed, visual perceptual organization, and working memory."  (Affidavit of Dorothy Brown ¶3).  This manifests itself in difficulty taking timed multiple choice tests.  She apparently has no difficulty when the test is continued.  Dr. Brown noted that "Lisa's strengths are her ability to express, and to retrieve information from long-term storage.  She also shows good ability in the area of abstract reasoning and problem solving when the task is untimed." (Id. Ex. C at 2).  The plaintiff's

5

learning disability does not appear to have affected other aspects of her life, including other aspects of her academic life. She has a bachelors and a masters degree in English. She has taught writing at the college level both before and since her dismissal from SNESL, and she is a published author (David Aff. Ex. B, Plaintiff's Answers to Defendant's Interrogatories Nos. 4 & 5; Hillinger Aff. Ex. A).

The inability to perform well on timed standardized tests is not, as a matter of law, a disability that substantially limits a major life activity. The Court dealt with this issue in <u>Baer v. National Bd. of Medical Examiners</u>, 2005 WL10027289 (D. Mass. May 3, 2005). In that case, the plaintiff was a medical school graduate who had been diagnosed with ADHD and learning disabilities. She had requested, and had been denied, additional time on the United States Medical Licensing Examination, which is a timed multiple choice test. She then brought suit against the defendant that administered the test claiming handicap discrimination under the ADA, and she sought a preliminary injunction to require the defendant to give her more time. The Court denied the injunction, holding that the plaintiff had not demonstrated a reasonable likelihood of success on the merits. The Court began by noting that

> there is, at least potentially, a difference between what a psychologist may mean when she uses the term "disability," and what the relevant statute means when it uses that term. It is possible for a person to be diagnosed by a psychologist as having a "learning disability," for example, and yet not be considered to have a disability within the meaning of the ADA. <u>Id.</u> at *3.

The Court acknowledged that reading and learning can be major life activities, but that the plaintiff had not demonstrated that her disability limited her reading and learning generally, or that it affected her in her activities of daily life. "Her claim is that she is disadvantaged when required to take standardized tests under regulated time pressure. ... The specific task of taking timed tests, however, is not the kind of 'major life activity' protected under the ADA." <u>Id.</u> at *4.

6

See Calef v. Gillette Co., 322 F.3d 75, 86 (1st Cir. 2003) (plaintiff not "disabled" because he had not shown a general effect on the ability to speak or learn in everyday life); Knapp v. Northwestern Union, 101 F.3d 473, 481 (7th Cir. 1996), cert. denied, 520 U.S. 1274 (1997) (" '[t]he impairment must limit [learning] generally' . ...  An impairment that interferes with an individual's ability to perform a particular function, but does not significantly decrease that individual's ability to obtain a satisfactory education otherwise, does not substantially limit the major life activity of learning.")

   **B.**  **The Plaintiff is Not a "Qualified Handicapped Person."**

In order to make a claim under the ADA or Section 504, the plaintiff must be a "qualified handicapped person." This is defined as:

> [w]ith respect to postsecondary and vocational education services, [as] a handicapped person who meets the academic and technical standards requisite to admission or participation in the recipient's education program or activity. 34 C.F.R. §104.3(l)(3).

It is undisputed that despite being granted the accommodations she requested, the plaintiff was unable to meet minimum academic standards. She failed the only two substantive courses she was taking, and she had a cumulative average of only 61.9.  This subjected her to academic dismissal under standards applicable to all students.

  Basic competence in torts and property law is essential to a legal education, passing the bar examination, and the practice of law.  These courses are typically taken in the first year because they, along with contracts, criminal law, and civil procedure, provide the foundation for advanced courses in law.  The plaintiff does not, nor could she, argue that she should be exempt from these courses.  The statutes on which the plaintiff relies specifically contemplate that

> [a]cademic requirements that the recipient can demonstrate are essential to the instruction being pursued by such student or to any directly related licensing requirement will not be regarded as

7

>discrimination within the meaning of this section. 34 C.F.R. §104.44(a).

See Guckenberger v. Boston University, 974 F. Supp. 106, 145 (D. Mass. 1997), aff'd, 8 F.3d 82 (1st Cir. 1998). The plaintiff was dismissed because of an inability to meet essential academic requirements for her program of study and for passing the bar examination. She was not dismissed for a discriminatory reason.

### C. The Defendant Made Reasonable Accommodations for the Plaintiff.

Because the defendant granted all of the accommodations the plaintiff requested, the plaintiff cannot argue that the defendant's failure to provide reasonable accommodations prevented her from being a "qualified handicapped person." The ADA defines discrimination to include "a failure to make reasonable modifications in policies, practices or procedures when such modifications are necessary" to accommodate individuals with disabilities. 42 U.S.C. §12182(b)(2)(A)(ii). The regulations promulgated under this section require educational institutions "to make such modifications to its academic requirements as are necessary to insure that such requirements do not have the effect of discriminating, on the basis of handicap, against a qualified handicapped applicant or student." 34 C.F.R. §104.44(a). The duty, however, is triggered only when a person makes a specific request for an accommodation. This "request must be 'sufficiently direct and specific,' giving notice that she needs a 'special accommodation.'... At the least, the request must explain how the accommodation requested is linked to some disability." Reed v. LaPage Bakeries, Inc., 244 F.3d 254, 261 (1st Cir. 2001).

As noted, the plaintiff requested transfers from her Legal Writing and Torts classes in the fall of 2002. This request was not based on any claim of a learning disability -- the plaintiff was not even diagnosed with a learning disability until May 2003 -- but SNESL accommodated her. When she was diagnosed with a learning disability in May 2003, she requested through her

8

psychologist that she be given extra time on examinations and be allowed to use a computer. SNESL granted these requests. Despite these accommodations, the plaintiff's marks went down. SNESL granted every accommodation the plaintiff requested before her academic dismissal. (Hillinger Aff. ¶ 12)

Although this ends the plaintiff's case, she makes the peculiar claim that SNESL is liable for failing to make an accommodation she never requested: that is, SNESL should have provided her with a "reader" for her examinations. This claim is both legally and factually wrong. First, as a legal matter, the plaintiff must make a specific request. SNESL "has no duty to divine the need for a special accommodation" where neither the plaintiff nor her psychologist have suggested that such an accommodation is needed. Reed, 244 F.3d at 261. Second, as a factual matter, SNESL had no reason to anticipate this need. The plaintiff alleges that SNESL did not wait for her psychological evaluation to be complete before dismissing her, but this is not true. She bases this claim on a statement in Dr. Brown's May 7, 2003 report that "[a] complete evaluation and report have not been completed." Dr. Brown meant by this that her formal report had not yet been prepared. On May 29, 2003, she prepared a formal Psychological Evaluation and gave it to the plaintiff who then gave a copy to SNESL. As of that date, Dr. Brown considered her evaluation complete. The April 22, 2004 letter in which she suggests that a "reader" might be helpful was not based on any additional testing (Brown Aff. ¶¶ 5-8). SNESL dismissed the plaintiff on June 26, 2003, well after Dr. Brown had finished all of the testing and had completed her evaluation and report. In any event, neither Dr. Brown nor the plaintiff ever gave a copy of the April 22, 2004 letter to SNESL. (Hillinger Aff. ¶ 17)

The plaintiff's own description of her learning disability is that she has an "inability to apply rules to fact patterns" and a problem "identifying issues." (Hillinger Aff. Ex. G) These

9

are serious obstacles to anyone thinking about becoming a lawyer. The defendant tried to help her overcome these problems by giving her every accommodation she requested, and she still failed. She has not demonstrated that she has the ability to perform at a minimally acceptable level, nor has she produced any expert opinion that <u>any</u> accommodation the defendant might grant her would enable her to successfully complete the required course of study. It would be a disservice to her, to other students, and to the defendant to retain her as a law student.[2] More importantly, the plaintiff has not and cannot demonstrate that the defendant discriminated against her on the basis of a handicap.

## II.   THE DEFENDANT IS NOT LIABLE FOR INFLICTION OF EMOTIONAL DISTRESS.

The plaintiff alleges that Professor Irene Scharf accused her of "stalking," which she characterizes as either intentional or negligent infliction of emotional distress. This claim is not actionable for two reasons: first, Professor Scharf never accused the plaintiff of stalking, and second, even if the allegation is accepted as true it does not amount to either intentional or negligent infliction of emotional distress.

### A.   Professor Scharf Did Not Accuse the Plaintiff of Stalking.

Professor Scharf denies having accused the plaintiff of stalking (Affidavit of Irene Scharf ¶ 4), and it is undisputed that the plaintiff never heard Professor Scharf accuse her of stalking. It

---

[2] The Defendant is not currently accredited by the American Bar Association, but is working toward accreditation. Standard 303(c) of the ABA Standards for Approval of Law Schools provides:

> A law school shall not continue the enrollment of a student whose inability to do satisfactory work is sufficiently manifest so that the student's continuation in school would inculcate false hopes, constitute economic exploitation, or detrimentally affect the education of other students.

is also undisputed that the plaintiff learned of the alleged accusation from a psychologist, Dr. Christine Frizzell (David Aff. Ex. B, Plaintiff's Answers to Defendant's Interrogatories No. 6).

There is some suggestion that Dr. Frizzell may have used this term figuratively to describe the fact that the plaintiff was sending Professor Scharf an excessive number of e-mails and making excessive requests for personal assistance. No reasonable person, however, would conclude that Professor Scharf, or anyone else, was accusing her of stalking. Nevertheless, the plaintiff claims she drew that conclusion. She discussed it with Dean Ward on February 4, and Dean Ward told her in no uncertain terms that Professor Scharf had not used the word "stalking" and had not accused her of stalking. (Affidavit of Robert V. Ward ¶ 2) He followed this with an email:

> After our conversation, I spoke with Associate Dean Michael Hillinger and Professor Irene Scharf and want you to know that Professor Scharf never used the term "stalking" when discussing the situation. (Ward Aff. ¶ 3, Ex. A).

Professor Scharf never used the word "stalking," and Dean Ward immediately corrected any misunderstanding the plaintiff may have gotten from her conversation with Dr. Frizzell. This sequence of events cannot form the basis of an emotional distress claim.

### B. Under the Circumstances of This Case An Accusation of "Stalking" Does Not Constitute Infliction of Emotional Distress.

Even if one were to assume that Professor Scharf used the word "stalking," the result is the same: it is not actionable as either intentional or negligent infliction of emotional distress.

#### 1. Intentional Infliction of Emotional Distress.

There are four elements of the tort of intentional infliction of emotional distress:

> (1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct…; (2) that the conduct was "extreme and outrageous," was "beyond all possible bounds of decency," and

11

> was "utterly intolerable in a civilized community…; (3) that the actions of the defendant were the cause of the plaintiff's distress...; and (4) that the emotional distress sustained by the plaintiff was "severe" and of a nature "that no reasonable man could be expected to endure it."

Agis v. Howard Johnson Co., 371 Mass. 140, 144-45, 355 N.E.2d 315, 318 (1976). See Yohe v. Nugent, 321 F.3d 35, 42 (1st Cir. 2003). The courts have stressed that liability cannot be based on "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities…" It is not enough

> that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages.

Foley v. Polaroid Corp., 400 Mass. 82, 99-100, 508 N.E.2d 72, 82 (1987), quoting, Restatement (Second) of Torts § 46 cmt. d (1965). Against this legal background, it is clear that an accusation of stalking under these circumstances does not amount to intentional infliction of emotional distress as a matter of law. First, if the plaintiff is to be believed, Professor Scharf made the accusation in a letter to Dean Ward (Rule 16.1 Joint Statement at 3-4). There is no evidence, or even an allegation, that Professor Scharf intended the contents of her conversation or letter to go beyond Dean Ward. The fact that Dr. Frizzell chose to relay the conversation to the plaintiff is not evidence that Professor Scharf intended to inflict emotional distress on the plaintiff.

Second, however else one might characterize the use of the word "stalking" in a private conversation, it is not "beyond all possible bounds of decency" or "utterly intolerable in a civilized community," especially under the circumstances of this case. Any reasonable person would have understood that the word was used figuratively. The plaintiff either understood that when Dr. Frizzell said it, or if she did not understand it immediately, she learned it the next day.

12

At worst, the comment falls into the class of unactionable "insults, indignities, threats, [or] annoyances."

Finally, if the plaintiff has suffered emotional distress, it is because she failed her classes despite getting the accommodation she requested, and was dismissed from SNESL on academic grounds. There is no indication that the accusation of "stalking" caused her any additional or different distress, or that any distress she did suffer was so severe "that no reasonable [person] could be expected to endure it."

### 2. **Negligent Infliction of Emotional Distress.**

There are five elements to the tort of negligent infliction of emotional distress: (1) negligence, (2) emotional distress, (3) causation, (4) physical harm manifested by objective symptoms, and (5) a reasonable person would have suffered emotional distress under the circumstances of the case. Conley v. Romeri, 60 Mass. App. 799, 801, 806 N.E.2d 933, 936 (2004); Gouin v. Gouin, 249 F.Supp.2d 62, 74 (D.Mass. 2003). The Supreme Judicial Court has noted that

> [a] successful negligent infliction of emotional distress claim… must do more than allege "mere upset, dismay, humiliation, grief and anger." Rather, plaintiff must corroborate the mental distress claims with enough objective evidence of harm to convince a judge that these claims present a sufficient likelihood of genuineness to go to trial.

Sullivan v. Boston Gas Co., 414 Mass. 129, 137-38, 605 N.E.2d 805, 809-10 (1993).[3] In this case, any claim of negligent infliction of emotional distress must fail. First, the plaintiff must

---

[3] Prior to Sullivan, a plaintiff had to substantiate objective physical symptoms with expert medical testimony. Payton v. Abbott Labs., 386 Mass. 540, 557, 437 N.E.2d 171, 181 (1987). Sullivan "expanded the range of symptoms that may provide physical harm," but it "did not eliminate the physical harm requirement." Guttierez v. MBTA, 437 Mass. 396, 412, 772 N.E.2d 552, 566 (2002). The tort remains disfavored due to the fear of fraudulent claims. Rochleau v. Town of Millbury, 115 F.Supp.2d 173, 180 (D.Mass. 2000).

establish a duty of care because "there can be no negligence where there is no duty." <u>Conley</u>, 60 Mass. App. Ct. at 801, 806 N.E.2d at 936.  Nothing in Massachusetts law creates a duty of care from a law professor to a student in connection with private conversations between the professor and her dean.  Second, there is no indication that the plaintiff has suffered any emotional distress that is additional to or different from the distress she suffered when she failed her law school classes, nor is there any indication the plaintiff has suffered physical harm.  Third, it is not foreseeable that a psychologist would relate the conversation to the plaintiff, that the plaintiff would misinterpret the conversation, and that the plaintiff would persist in this misinterpretation even after being told the facts.  Finally, as a matter of law, given the circumstances of this case, no reasonable person would have suffered emotional distress.

## **CONCLUSION**

For the above reasons, the defendant requests that its motion for summary judgment be allowed.

SOUTHERN NEW ENGLAND SCHOOL OF LAW,

By its attorneys,

/s/Allen N. David
_____
Allen N. David, BBO # 115000
Elizabeth A. Houlding, BBO # 645981
Peabody & Arnold LLP
30 Rowes Wharf
Boston, MA  02110
Dated:  August 3, 2005                                         (617) 951-2100

PABOS2:ADAVID:610767_1
9502-91139